[Crim. No. 13950.    Second Dist., Div. One.    Mar. 14, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. HARRY PRINCETON HENDERSON, Defendant and Appellant.

Bruce A. Toor, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch. Attorney General, William E. James, Assistant Attorney General, and Thomas Kerrigan, Deputy Attorney General, for Plaintiff and Respondent.

FOURT, J.—This is an appeal from a judgment of conviction of robbery and assault with intent to commit robbery.

In an information filed in Los Angeles on September 29, 1966, Henderson, with Ralph Davis as a codefendant, was charged in count 1 with robbing Donald Reid of certain personal property on August 8, 1966, in count 2 with robbing Oscar Bright of certain personal property on August 8, 1966, in count 3 with robbing George Blassinghame of certain personal property on August 8, 1966, in count 4 with committing an assault upon Donald Reid with the intent by means of force to take personal property from the possession of Reid. It was further separately alleged in each count that defendants were at the time of the commission of the respective offenses armed with deadly weapons, namely a pistol and a rifle. It was further alleged that Henderson had previously been convicted of robbery in Los Angeles in February 1964. Henderson admitted the previous conviction and pleaded not guilty. In a jury trial Henderson was found guilty as charged and was sentenced to the state prison. A timely notice of appeal was filed.

A résumé of some of the facts is as follows: Reid on August 8, 1966, had $1,560 in cash in his possession and went to Dee's Cafe in the evening where he exhibited the money to Blassinghame and Bright. Reid invited Blassinghame and Bright to come by his home in San Fernando and they apparently accepted the invitation for they were at Reid's home at about 8:30 p.m. Reid and his two friends were in Reid's living room having a drink when there was a knock on the door. Reid went to answer the knock at the door and when he arrived at the front door preparatory to opening it the door was suddenly opened and two men wearing nylon stockings over their heads and down to the area between their lips and chins entered the room. Reid could see the faces of the men well enough to know who they were. The men, one of whom was Henderson, stated: ''This is a stickup. We want what you've got.'' Reid replied in effect that no one there had anything of value whereupon Henderson came up to Reid and hit Reid across the head with the butt of the rifle or shotgun thereby causing Reid to fall to the floor. Henderson then kicked Reid in the stomach. Davis was armed with a pistol. At about this time the two robbers told Blassinghame and Bright to ''Turn your backs to us.''

The television was in operation in an adjoining room and Henderson told Davis to see who was in the adjoining room. Davis complied and returned to the room with Reid's stepdaughter, Jean Lee. Henderson attempted to loosen the belt of

Reid's trousers and Reid thereupon took off his pants. Henderson told Davis, who was standing by Blassinghame and Bright, "Let's go." and then stated to the victims, "We don't want nobody to move for five or ten minutes," and then said, "This is just to let you know I'm not kidding" and Henderson fired a shot into the living room. The robbers then left. Reid recognized Henderson's voice during the robbery and while hospitalized he identified Henderson's photograph. Reid required surgery and stayed in the hospital for a week or 10 days and then was transferred to a Veterans Hospital where he stayed for a month or so. Reid had seen both of the robbers prior to the robbery at Dee's Cafe, at another bar and at a house which was next door to a former friend of Reid's. Reid had talked with each of the men previously and had seen Henderson in an old gray automobile. During the week following Reid's release from the hospital, he saw the two men in a yellow 1966 Pontiac GTO automobile parked near Dee's Cafe.

Bright testified that his wallet containing $40 or more was taken from him at the time of the robbery of Reid at Reid's house, that a gun was pointed at him. Further, that while he had his face on the floor he heard Reid call out, "Ouch" and later saw blood on Reid's head. Bright did not think that Henderson was one of the robbers.

Blassinghame stated that the door was kicked open and someone said, "All of you hit the floor." that he saw a rifle and put his head on a couch and someone took his wallet from his pocket. He further said there was a "crack" kind of a sound and Reid then said "Ugh." Blassinghame could not identify the robbers.

A witness testified that in the afternoon of September 3, 1966, he saw Henderson driving a gray 1959 Plymouth automobile (depicted in Exhibits 3 and 4). An automobile salesman stated that on August 9, 1966, he sold to Davis a yellow 1966 GTO LeMans automobile upon which Davis had made a cash down-payment of $480.25.

A witness who lived across the street from Reid stated that he saw two tall Negro men, between 8:30 and 9 p.m. on August 8, 1966, walk in front of the gray Plymouth car depicted in Exhibits 3 and 4.

Appellant now asserts that the judge erred in failing to have all of the identification evidence of Reid read back to the jury, that the evidence of sudden wealth was inadmissible, that the jury was improperly instructed and that the prose-

cutor was guilty of misconduct in his argument to the jury.

The record discloses that after several hours of deliberation the jury apparently requested that Reid's testimony with reference to the identification of the robbers "at the time of the commission of the offense" be read back to them. The court reporter was directed to find such portions of the testimony and upon direction of the court read back to the jury Reid's testimony "concerning the identification of the perpetrators at the time of the commission of the offense." This consists of about 12 pages of the reporter's transcript. The jury was then directed to continue with its deliberation. Out of the presence of the jury the prosecutor suggested to the court that the reporter had omitted some testimony of Reid to the effect that one of the defendants had a goatee or beard. Counsel for appellant stated "Yes, I think Mr. Reid did mention that—" The judge expressed confidence in the reporter and the prosecutor indicated that his notes showed a reference to a goatee or a beard and counsel for appellant replied, "There was mention of the beard and the photographs in the hospital and also in the lineup." The judge then said, ". . . that's my point, but that is not what was asked for. They asked for the identification given at the time of the crime." Neither of defense counsel made any objection to the testimony read nor did either of them request the reading of additional testimony. Appellant presently makes no reference to any other certain testimony which the court should have read to the jury. Clearly the jury got what it asked for and that is all that we are concerned with under the circumstances.

The evidence with reference to Davis' purchasing an automobile on the day following the robbery did not concern Henderson. There was no evidence that Henderson had exhibited any sudden wealth. The evidence in question had to do with Davis and not Henderson and could not have prejudiced Henderson.

In the prosecutor's argument to the jury, he said: "Now, the question in my mind is on whose side is Mr. Bright? What is Mr. Bright's real interest in the case? Mr. Bright was in the pool hall and he saw the money. The bartender was there and he saw the money. The question which comes up in my mind, and it may come up in yours. as to why Mr. Reid was robbed. Now, it is possible that Mr. Bright saw that money at Dee's and told his friend. Mr. Henderson about it." Counsel for Henderson objected to the statement by the prosecutor upon the theory that he was attempting to impeach

his own witness. Out of the presence of the jury counsel for Henderson argued, "I think if you want to impeach him you have to do it deliberately with malice aforethought, by putting somebody on, and he can't impeach him this way." The judge responded by stating in effect that the prosecutor had the right to point out certain possibilities, to make comments and draw inferences from the testimony, that it was shown in the evidence that the witness and Henderson were quite friendly. Appellant now urges that the judge erred in failing to instruct the jury that Henderson was not guilty of robbing Bright if the taking of Bright's property was not by force or fear, *i.e.*, but rather by collusion. No such instruction was requested. Full instructions on robbery were given and the implied finding of the jury is that there was no collusion. Had Henderson wanted such an instruction he should have presented it. (*People* v. *Robinson,* 180 Cal.App.2d 745, 752 [4 Cal.Rptr. 679].)

In the closing argument the prosecutor in answering the arguments of counsel for the defendants said:

"Mr. Charig also pointed out the fact that no stockings were found on either of the defendants when they were arrested.

"I think that is ridiculous that they're going to carry around something like that for a month. Hardly.

"Also he doubts the fact that you could see the goatee and yet Mr. Reid stated that the stocking mask didn't come below the chin, and Mr. Reid was on the floor and he was testifying to what he saw on the underside of their faces."

Admittedly Reid did not testify that either of the robbers wore a goatee or a beard. This statement however, taken as it must as a part of all that was said in court, could not possibly have been prejudicial. Reid positively identified Henderson as one of the robbers. If it was error it was harmless. (Cal. Const., art. VI, § 13.)

We have considered the matters raised by appellant and find no merit to any of his contentions.

The attempted appeal from the order denying a motion for a new trial is dismissed.

The judgment is affirmed.

Wood, P. J., and Lillie, J., concurred.

A petition for a rehearing was denied April 8, 1968, and appellant's petition for a hearing by the Supreme Court was denied May 9, 1968.